(No. 77-CC-0329—

ANTHONY CAREV, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Order filed October 28, 1981.*

*Order on denial of rehearing filed January 21, 1982.*

JENNER & BLOCK (CHRISTOPHER J. MCELROY, of counsel), for Claimant.

TYRONE C. FAHNER, Attorney General (PAUL SENGPIEHL, Assistant Attorney General, of counsel), for Respondent.

HOLDERMAN, J.

This is an action in tort brought by Claimant for damages he sustained when he was a prisoner at the Joliet Correctional Center, Joliet, Illinois, and was set upon and beaten by two other inmates.

Claimant's theory of his case is set out succinctly in his complaint, reproduced in part as follows:

"1. This is an action in tort pursuant to the Court of Claims Act, 37 Ill. Rev. Stat. § 439.8 (d).

2. On or about August 16, 1975, and prior thereto, the State of Illinois, respondent herein, owned, controlled and operated the Joliet Correctional Center, Joliet, Illinois.

3. On or about August 16, 1975 Officer Leon Pollard was employed by respondent as a guard at Joliet Correctional Center.

4. On or about August 16, 1975, claimant was incarcerated in Joliet Correctional Center.

5. On or about August 16, 1975 Officer Pollard, acting within the scope of his employment, informed claimant that there was a visitor to see him. Officer Pollard opened claimant's cell and immediately left the area. Officer Pollard did not have a visitor ticket for claimant. Claimant is informed and believes that Officer Pollard was acting only upon a statement made by a porter (an inmate) that claimant had a visitor. Claimant is further informed and believes that Officer Pollard's conduct was contrary to established prison procedures. In so conducting himself, Officer Pollard was acting negligently and without due care for the safety of claimant's person.

6. Shortly after Officer Pollard opened claimant's eighth gallery cell, claimant proceeded toward the sergeant's desk on the main floor. As a direct and proximate result of Officer Pollard's conduct, claimant was viciously attacked and injured by two unidentified assailants while he was descending to the main floor.

7. Claimant is informed and believes that no one had actually come to visit him at the time of the foregoing acts.

8. At all times herein mentioned, claimant was in the exercise of due care for his own safety.

9. By reason of these facts, claimant suffered great bodily injury, with accompanying pain. Claimant is informed and believes that his face will be permanently scarred. Claimant also has no sensation around part of his nose. By reason of these facts, claimant also was unable to work at his job as a

machinist in the M&M Machine Shop at Joliet Correction Center between August 16, 1975 and October 1, 1975."

Before discussing the testimony of the witnesses it will be helpful to consider some of Claimant's documentary evidence admitted into evidence by agreement and designated collectively as the departmental report.

Claimant's exhibit No. 1 was a letter dated September 29, 1975, from the employee's review board to warden Ernest E. Morris concerning Officer Pollard's role in the incident under litigation.

"A Review Board Hearing was held on this date with Officer Levon Pollard relative to three charges submitted against him, two of these charges were for violation of rule #66 of the employee's rule book, failure to notify the institution of his intended absence; the third charge was for not following rules and regulations on his assignment. Present at his hearing were Asst. Warden William Welch, Major A. Anderson, Lt. Gaylon Yates and the Union Representative, Mrs. Ruth Haggerty. . . .

Capt. C. Bryan reported under date of August 16, 1975, at approximately 8:45 a.m., Officer Pollard was assigned to front and back keys of #5, #6, #7 and #8 galleries in the west cellhouse. Officer Pollard opened cell #830 and let a resident out of his cell for a visit. Mr. Pollard did not receive any notification from the cellhouse office that there was a visit for this resident, he acted on what he had been told by a resident assigned to cellhouse help. As a result this resident was seriously injured on the flag in front of #7 and #8 gallery. This entire incident appeared to be set up by other residents.

The above report was read to Mr. Pollard and he was asked if the report was true as read and if he had any comment to make in his behalf. The officer did not admit or deny his guilt in the above charge. . . .

. . . . In view of the seriousness of his violation of not following the rules and regulations with regard to permitting a resident out of his cell without notification from the cellhouse officer and taking the word from a resident that the resident in cell #830 had a visit, the Board recommends the following:

The Board is of the opinion that Officer Pollard is guilty on two charges; not remembering why he was absent under date of August 10, 1975 and failed to notify the institution. Guilty of allowing a resident out of his cell without notification of the cellhouse office, negligent in the knowledge of his assigned duties.

The Board recommends (1) day of suspension for not notifying the institution of his absence, (15) days suspension for negligence in the performance of his duty, to be imposed on Officer Levon Pollard."

Memorandum dated September 19, 1979, from Den-

nis J. Wolff, warden, to Liz Krug, administrative assistant legal services division.

"Subject: VISITING PROCEDURES AT THE JOLIET CORRECTIONAL CENTER

Per your request, there are no written procedures pertaining to the movement of a resident from the Cellhouse for a visit. Upon checking with several employees who worked in the Cellhouse during 1975, Captain Norris, Lieutenant Cantrill, Lieutenant Hannah, and Sergeant Burnett, the following is the procedure that was followed:

Upon receiving notification of a visit, a resident Call Ticket was filled out, by an Officer in the Cellhouse Office or the Cellhouse door. This ticket was then given to a resident runner who carried the ticket to the Gallery Officer. The Gallery Officer would go to the resident's cell, give the resident the ticket and release the resident from the cell. The resident would then report to the Cellhouse door, where he was logged out and sent to the Visiting Room. At no time has it been the policy of this Institution to release residents from their cells for a visit without a Call Ticket."

Claimant arrived at the Joliet Correctional Center in July of 1975, and during the first or second week of August 1975 was assigned to the facility machine shop. He had come from the Cook County jail.

Called as a witness by Respondent under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 60), Claimant testified that while in Cook County jail he had been attacked by a black prisoner. He recognized this prisoner in the machine shop at Joliet Correctional Center, and the prisoner recognized him and threatened him. This incident occurred on the afternoon of Friday, August 15, 1975, as the inmates were leaving the machine shop to be returned to their cells. Claimant decided that he would wait until Monday to tell the authorities that he didn't want to work at the machine shop.

"Q—did you then tell any of the officers or employees of the Administration that you had seen a person who possibly attacked you in Cook County?

A No, sir. I had no time. What happened was this was right when we were leaving in the afternoon, and we are shuttled up to the cells. I stayed in my cell. This was on a Friday evening, and I didn't leave it. I didn't have a chance, because on the weekend, there's nobody there you can really talk to.

You cannot—you've got to put in a request form, I'm pretty sure, to speak to somebody, and then I was going to wait until Monday when everybody came in to say that I didn't want to work at the Machine Shop and explain why, but Saturday morning, this incident happened. That's it."

On arriving at the diagnostic center from Cook County jail Claimant had told several counselors that he had been attacked while in the jail. It should be pointed out, however, that there is nothing in the record to indicate that Claimant gave the name of his attacker or any other information to the counselors to alert the institution that his attacker in the Cook County jail might already be an inmate at the Joliet Correctional Center.

Ernest E. Morris, warden of Joliet Correctional Center on August 16, 1975, testified that when a call ticket is issued for a prisoner the prisoner's name and number and destination are recorded on a movement chart. He also testified that at any time there are prisoners moving freely in a cellhouse.

"Q Well, how would it happen then that those two men were sitting on the stairs? How did they get there?

A They are—in each cellhouse, I cannot give you the exact number, but there are approximately anywhere from 15 to 30 residents assigned that are in that cell house, not locked up, who are detailed to clean that cell house, called 'cell house help'.

There's also residents coming and going up and down the steps on their movement, unescorted, returning from either a call ticket or in line coming back. And according to the reports that I read, much as I could remember, there were still some lines coming back from breakfast into that cell house, approximately 8:40. But there are approximately 15 to 30 residents assigned on the galleries, on the catwalks, on the landings doing the necessary cleaning."

"Q So at any time, anyone who would be released from the cell could be attacked by these individuals who were out of their cells? Is that possible?

A Yes, it is, with or without an officer present."

Only when a prisoner is placed in protective custody (or in segregation) is he personally escorted by an officer.

As of August 1975, to be placed in protective custody

a prisoner merely had to request it. After a prisoner is placed in protective custody, he would appear before a committee to show justification why he should be kept there.

Warden Morris did not know whether incoming prisoners at Joliet Correctional Center were advised during their indoctrination that protective custody was available to them.

Mr. Morris also testified that in situations where the call ticket method had been properly used, other prisoners on their way to see a visitor had been attacked.

"Q Mr. Morris, do you know of other incidents where the procedure of taking a ticket to a particular cell guard, according to the procedures of visitation, have resulted in attack on a prisoner?

A I am not without knowledge of records. I have in my mind—I know of dozens of cases, not only of attack, but riots. I will elaborate that one of the biggest escapes from Stateville occurred because of that."

He also testified that prior to the incident in question, on weekends, when the guards were not at full strength, prisoners were sometimes let out to see visitors without a call ticket, and that on such previous occasions no prisoners had been attacked.

He further testified that after the incident Claimant asked for protective custody.

In reply to the question, "What is the purpose of the call ticket system?", the witness replied:

"The purpose of a call ticket is to insure that the staff knows where that resident is designated to go. And they log him out at the time that he was leaving, and log him when he arrives there. But according to the counselor's statement, it does not insure that man's safety en route, unless he is under direct supervision."

Earlier he stated:

"It's not designed primarily for the protection, per se, for the resident. It's for control; to make sure, to insure that a resident doesn't wander or roam around the institution at will."

The documentary evidence establishes that Officer Pollard negligently disregarded the regulations of the institution in letting Claimant out of his cell without written notification from the cellhouse officer that Claimant had a visitor. For this he received a 15-day suspension.

But Officer Pollard's negligence is not the issue in this case. The issue is whether his negligence was the proximate cause of Claimant's injuries.

True, Capt. C.A. Bryan, acting shift commander, in a report to Major Anderson stated,

"But had Officer L. Pollard followed the rules and regulations of this institution, this incident could never have happened."

This statement is true but it does not dispose of the issue of proximate cause.

The subject of proximate cause is discussed in chapter 5 of Illinois Law & Practice as follows:

### § 109. — Foreseeability of Acts

"Where the conduct of more than one person serves to bring about an injury or damage, the test which should be applied in determining the question of proximate cause is whether the first wrongdoer might have reasonably anticipated the intervening act as a natural and probable result of his own negligence.

The test which should be applied in determining the question of proximate cause where the conduct of more than one person serves to bring about an injury or damage is whether the first wrongdoer might have reasonably anticipated the intervening act as a natural and probable result of his own negligence. If he could not, in the exercise of reasonable diligence, have anticipated the third person's act and the third person was not under his control, the negligence of the first wrongdoer was not a proximate cause of the injury or damage.

This principle was applied in the case of Dabrowski v. Illinois Cent. R. Co., 1940, wherein two small boys found a fusee on a railroad right of way and took it home and the smaller boy subsequently obtained the fusee and set it afire, with the result that it set his sister's dress afire. The Appellate Court held that the alleged negligence of the railroad company in permitting the fusee to remain on its right of way was not the proximate cause of the girl's injury since the company could not have foreseen the acts of the boys."

## § 109 NEGLIGENCE

"On the other hand, the negligence of the first wrongdoer is the proximate cause of the injury or damage where it contributed thereto and the intervening act of the third person was of such a nature that it could have been reasonably anticipated by the first wrongdoer as a result of his own act or omission. In such a case the intervening act of the third person does not break the causal connection between the negligence of the first wrongdoer and the injurious result and does not serve to excuse such negligence.

The fact that the third person's intervening act or omission is, in itself, a negligent act or omission does not make it a superseding cause of the injury or damage where the first wrongdoer, at the time of his negligent conduct, should have realized that a third person might so act, or a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person acted in the manner in which he did or where the intervening act was a normal response to a situation created by the first wrongdoer's conduct and the manner in which it was done was not extraordinarily negligent."

## § 110. — Illegal or Criminal Acts

"The defendant's negligence is too remote to constitute a proximate cause of an injury or damage where an independent illegal or criminal act of a third person, which could not reasonably have been foreseen, and without which the injury or damage would not have been sustained, intervenes to bring it about, there being no duty to anticipate the illegal or criminal acts of others by which damage is done unless they are of such a nature that they can reasonably be foreseen.

However, the intervention of a criminal act by a third person does not necessarily interrupt the relation of cause and effect between negligence and injury, and where an independent illegal or criminal act of a third person is of a nature which might have been anticipated, and which it is the defendant's duty to provide against, he may be held liable for a breach of such duty, notwithstanding the production of injuries by the intervention of such illegal or criminal act. Under such circumstances, the chain of causation between the negligence for which the defendant is responsible and the injurious result is not broken by the intervening act."

Clearly the two men who assaulted Claimant were not under Officer Pollard's control, and our opinion is that he had no reason to anticipate that anyone was trying to get Claimant released from his cell for the express purpose of assaulting him.

The regulation in question was not designed for the protection of residents but to control their movement. There was no reason for Officer Pollard to anticipate that

third persons would commit a criminal act against Claimant as a result of his breach of the regulation.

Claim denied.

## ORDER ON DENIAL OF REHEARING

HOLDERMAN, J.

Claimant contends in his motion for rehearing that a *prima facie* case is made in favor of him based on certain departmental reports cited. It is true that Rule 14 of the Court of Claims provides that such reports are *prima facie* evidence of the *facts* set forth therein. However, any *conclusion* arising from the facts is still open to the Court's judgment. The fact that a report stated that the incident could never have happened except for the failure of the officer to follow procedural rules, in effect, is a determination that doesn't circumvent the Court's jurisdiction to determine liability. It is true that the incident wouldn't have happened but for the conduct of the officer but that doesn't make his conduct conclusively a proximate cause.

We have determined after a full hearing that the conduct of the officer was not the proximate cause and from this conclusion we do not now deviate.

Motion for rehearing overruled.