(No. 81-CC-0932—

MAURICE WOODFORK, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed September 6, 1983.*

MAURICE WOODFORK, *pro se*, for Claimant.

NEIL F. HARTIGAN, Attorney General (GLEN P. LARNER, Assistant Attorney General, of counsel), for Respondent.

ROE, C.J.

This is a claim brought by Claimant, Maurice Woodfork, a resident of Stateville Correctional Center, for personal injuries sustained by him when he was beaten by his cellmate during the early morning hours of July 1,

1980. Testimony was taken in this cause on December 10, 1982, and on March 3, 1983.

The facts are as follows:

Prior to the incident in question Claimant lived on 4-Gallery and worked in dining room B, where he was approached by Vice Lord gang members who told him he would have to join their gang. (Tr. 6). On or about June 24, 1980, Claimant wrote a letter to the appropriate prison officials explaining that he was having problems with certain residents on his work assignment. On or about June 27, 1980, Claimant had an interview with case work supervisor Ron Fleming, in which he told Fleming that he wanted a change of job assignment for his own safety. But he did not tell Fleming that the persons causing the trouble were Vice Lords. (Tr. 6).

"Resident approached me about problems associated with his work detail. Stating he was experiencing some difficulties with residents on that detail. At no time did he indicate who the people were or what organization they might belong to. However, it was mutually decided that it was serious enough to warrant a change of assignment. Further, it was mutually decided that the change of assignment would be from the Dining Room Detail to Park & Terrace." (Departmental report.)

The above material (hearsay as set forth in the departmental report) was corroborated by Claimant:

"I never did state to him what organization or what people was involved. I didn't know the people and I didn't know that they were Vice Lords. Right at the time until I sought out information from other guys that I knew." (Tr. 7.)

Under administrative procedures in force in the institution, when Claimant's work assignment was changed his living quarters were also changed. Upon being transferred from the dining room detail to park and terrace detail, Claimant was moved from 4-Gallery to cell house E. In cell house E there was a vacancy in cell 257, a two-man cell, and Claimant was assigned to that cell.

As ordered by the administration, on or about Friday or Saturday, June 27 or 28, 1980, Claimant moved himself and his property to his new cell. (Tr. 8-9). When Claimant moved into his new cell his cellmate was not there. But later in the day his cellmate returned to the cell, and Claimant discovered that he was someone whom Claimant had previously noticed associating with members of the Vice Lords in the dining room.

Claimant's new cellmate, one Preness Crusoe, told Claimant that he was not welcome in the cell because he was not a member of the Vice Lords.

"Well, we had discussion and we started talking about he really didn't want me in the cell without me being affiliated with no organizations." (Tr. 9.)

"Well, he just — I don't remember it word for word, but we exchanged words about me being in his cell and that he really didn't appreciate me standing there because I wasn't hooked in the Vice Lord organization or no organization for that fact." (Tr. 10.)

In a brief filed by Claimant, in response to a motion to dismiss filed by Respondent at an earlier stage of this case, Claimant detailed subsequent events as follows:

"On the morning of June 30th, 1980, between the time of approximately 2:30 a.m. to 4:00 a.m., Claimant, while using the toilet and without warning, was attacked by Resident Crusoe with clear intention to rape Claimant; the struggle insued and the end result merited Claimant's personal injuries.

During the struggle, Claimant repeatedly screamed to the tower guard for help. None of the security guards in the unit would come to investigate the problem. Claimant at last managed to place Crusoe in a pin position and held him for what is estimated about a half hour, after which Crusoe convinced Claimant for his release and promised to give Claimant no more trouble. Both residents returned to bed, after which Lt. Jordan came to inquire about some noise.

Lt. Jordan inspected several cells before reaching Claimant's cell, asking if there was any problems, Claimant remained silent and resident Crusoe offered oral denials. Lt. Jordan left, Claimant went to sleep and Crusoe assaulted Claimant in his sleep with a wooden stool to start."

At the hearing of this case on March 3, 1983, Claimant verified that the account set forth above was correct. The date given by Claimant of Monday, June 30, 1980, is in error, however; prison reports and hospital

records show that the attack occurred in the early morning hours of Tuesday, July 1, 1980.

Claimant received severe facial injuries during the attack.

Claimant's theory of the case is that the State was negligent in,

(1) Assigning Claimant to a new cell without first screening his new cellmate:

"Resident sought relief from hostile gang members of the Vice Lords who were seeking to molest him on his work assignment in dining room. Formal notice was given to Case Work Supervisor Ron Fleming concerning the problem in which Mr. Fleming reassigned resident to another job which required change in his living quarters. This reassignment of living quarters placed resident in direct contact with the foes he sought to escape, making it convenient for a direct sexual attack by his new cellmate at 2:30 in the morning. Resisting this rape attempt resulted to Claimant's injuries in which damages are currently sought."

Notice of intention to commence action in the Court of Claims.

(2) Causing Claimant to be transferred to the new cell during the weekend, when case work supervisor, Ron Fleming, was not present in the institution.

With respect to (1), Supervisor Fleming testified that Claimant did not state that he was having trouble with the Vice Lords. He additionally testified that it was not the policy of the institution to screen cellmates:

"Q. Now, Mr. Fleming, does the institution make any background checks before they pick cell assignments?

A. No.

Q. None whatever?

A. No. The institution was set up on a unit management back in '78 or '79. At that point, the institution was broken up into three groups. There was a Group 1, a Group 2, and a Group 3.

Group 1 was considered inmates who are doing heavy time, had some violence associated with the offense that they were incarcerated for, and whose background-wise, displinary-wise [sic], were not a very good displinary record. Their disciplinary records were not very good.

Then Group 2 was the middle-of-the-road people who, although the records may not have been so good behaviorwise, their offenses were not as serious or their offense could not be serious, but their behavior was not too bad and this is our middle-of-the-road people. Group 3, who were generally the general population of people and that's the way it was split up.

Unit F and Unit E was Group 1, housing, meaning that all those people that were in those two units were people who were designated by the institution as Group 1, heavyweight.

Q. What group is Mr. Woodfork in?

A. He was in Group 1.

Q. In other words, the institution made some adverse judgment of him because his offense or behavior caused him to be placed in Group 1?

A. Group 1, yes.

Q. Both Mr. Caruso [sic] and Mr. Woodfork were classified as Group 1 people?

A. Yes.

Q. Even though Mr. Woodfork's term is much lighter than Mr. Caruso [sic]?

A. Yes.

Q. Other than dividing the residents into Groups 1, 2 and 3, the institution does not make any further check as to whether a given inmate had been known to be a troublemaker or dangerous?

A. Not when you are doing just cell assignments or job assignments. Only in the case of transfers, in restoration of grade, or security reduction in those three areas, but not in just a cell assignment or a job assignment."

With respect to (2), Claimant was not attacked until the early morning hours of Tuesday, July 1, 1982. He had ample opportunity between the time he met his new cellmate and the actual attack to ask to be put into protective custody or even to be walked to segregation.

Claimant did not feel that he was in danger:

"Claimant had no reason of alarm to think an emergency existed that could not wait until the following morning, as his cellmate Crusoe had again went out to work somewhere in the dietary department and no words had exchanged between them." (Reply brief, p. 4.)

Moreover, when the guards came to the cell after Crusoe's first attack on Claimant, Claimant instead of asking to be put into protective custody or to be taken out of the cell *remained silent*. This point was conclusively verified both by Claimant and by Lt. Jordan at the March 3, 1982, hearing.

While the State has a duty to provide for the safety of Claimant while he is a resident of an Illinois correctional institution, we find Claimant, has completely failed to prove that the State negligently breached its duty in any way.

Claim denied.