(No. 83-CC-2545– )

PAUL PETRUSAK, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed May 14, 1987.*

TIMOTHY T. MCLAUGHLIN, for Claimant.

NEIL F. HARTIGAN, Attorney General (H. ALFRED RYAN, KATHLEEN O'BRIEN, and JOHN BUCKLEY, Assistant Attorneys General, of counsel), for Respondent.

MONTANA, C.J.

Paul Petrusak, a former inmate at the Pontiac Correctional Center, brought this action sounding in tort for personal injuries received in a stabbing incident while he was incarcerated. A hearing was held by Commissioner John Simpson, briefs were filed, and the Commissioner filed his report. This is a serious matter and the Court has given it careful consideration.

The State is not an insurer as to the safety of an

inmate in its custody. It does however have a duty to exercise reasonable care under the circumstances to prevent its inmates from suffering harm at the hands of other inmates. What is reasonable under the circumstances will necessarily vary from case to case. Reasonableness has to be judged in view of the prison environment. In this type of case we must recognize, and take care so as not to unduly interfere with, the large amount of discretion which must be accorded prison officials in handling the day-to-day affairs of operating an institution for persons convicted of crimes.

Foreseeability of potential for harm is a necessary element which must be proven by the preponderance of the evidence in this type of case. What is foreseeable necessarily must be judged by the facts in each case and by taking judicial notice of the prison environment.

The facts in the case at bar are for the most part undisputed. Most of the arguments in the briefs were directed at the weight to be attached to the facts and the conclusions to be drawn from them. The evidence was as follows.

Prior to the incident the Claimant had been working in the officers' kitchen. On or about December 1, 1982, the Claimant was apprehended taking a 100 pound bag of sugar from the officers' kitchen. As a result of this offense, he lost his job. Up to that time he had been residing in cell 338. This cell was in an area reserved for certain assigned workers. With the loss of his job, the Claimant was no longer qualified for a cell in this area.

Shortly thereafter, on December 7, 1982, the gallery officer notified Claimant he had been assigned to a cell in gallery five. Claimant refused to move stating that because he would not join a gang called the Northsiders

he would be dead in a week if he moved to gallery five. He wrote a note to one Lieutenant Staley asking to be put in protective custody. Following receipt of the note by Lieutenant Staley, Claimant was taken the same day to the office of Warden McGinnis for an interview.

Claimant explained his problem to Warden McGinnis and asked to be put in protective custody:

"Q. What if anything did you say to the warden?

A. I explained the same thing to the warden and the food supervisor as I explained to Lieutenant Staley, a gallery officer, that my life had been threatened by a gang member for refusing to join, and once I was removed from three gallery, as they say, it was all over with.

Q. Did you request protective custody?

A. Yes, sir, I did." (Tr. 95.)

Contrary to Department of Corrections regulations (as will be discussed later on) Warden McGinnis did not immediately put Claimant in protective custody, but temporarily put him on deadlock status in a cell on gallery four pending investigation of the matter:

"Q. What if anything did Warden McGinnis say to you in response to that situation?

A. After I explained the situation to him, he said that I would temporarily be removed to the back of four gallery which is used basically as a deadlock gallery as investigation for segregation purposes.

Q. What if anything did he say to you about protective custody?

A. He said it would have to be investigated for them to determine whether I rated protective custody or not, to prove my allegations." (Tr. 95.)

Claimant was then moved to cell 448 where he remained until December 16, 1982.

Because Claimant had refused to move, a disciplinary ticket was written on him. In response to the ticket, on or about December 11, 1982, he appeared before the adjustment committee and again asked for protective custody.

On December 15, 1982, inmate Randy Brackett (the

inmate who stabbed Claimant on December 16, 1982) tried to stab Claimant through the bars of cell 448.

"Mr. McLaughlin: Q. What if anything unusual happened on December 15, 1982?

A. It was sometime before twelve o'clock, before the noon meal, when I was approached by a man. As far as I know, I had never seen him before. He was a resident. He called me to the bars of the cell and said he wanted to talk to me for a minute. I stepped up to the bars and folded my arms, and he stood there, and he asked me what my name was, and I told him, and he reached through the bars and grabbed me by my T-shirt; and as soon as he grabbed me, Randy Brackett stepped around the corner from the cell next to mine and tried to put his hand through the bar. He had a knife in his hand. When the hand came through the cell, I tried to pull him in. I ripped the front of my T-shirt.

At that time, Lieutenant Groskreutz walked through the back of the gallery. I was three cells from the end, so he saw everything that was going on.

Lieutenant Groskreutz ordered me to let him go and Brackett took off toward the front of the gallery which is all the way on the other end. He went through the main gate and down the stairs. The gentleman who grabbed my shirt jumped over the gallery off of four gallery on to two and underneath the walkway where you couldn't see him, and that's when Lieutenant Groskreutz came in the gallery.

He asked me what had happened, and I told him, and he left me; and about ten minutes later, Lieutenant Groskreutz came back; and he handcuffed me and took me to the investigator's office." (Tr. 97-98.)

Again Claimant was not put in the protective custody unit but was sent back to cell 448, but the cell was deadlocked:

"Q. What did you say to the investigator and what did he say to you?

A. I explained the situation to him again from the beginning, starting as of December 7th; and I described the occurrence that had just taken place, and he temporarily assigned me to P.C. deadlock pending investigation.

Q. What happened then?

A. That's when I was returned to the back of four gallery.

Q. Were you placed on deadlock?

A. Yes, sir." (Tr. 100.)

Immediately following the incident Lieutenant Groskreutz searched inmate Brackett for the knife. Although no weapons were found on inmate Brackett, in an interview with Brackett by one Sergeant Epley

conducted the day of the stabbing which gave rise to this claim Brackett stated he had the knife on his person:

"Q. Did you have a homemade knife yesterday?

A. Yes, the same shank I used to stab him with today.

Q. Where have you been holding the shank since yesterday?

A. I had it when Lt. Groskreutz shook me down yesterday on one gallery. I had the shank in the front of my pants and Groskreutz missed it. He took me to my cell #246 south cellhouse, shook down my cell and I then went in the cell with my shank on me."

Exhibit 2

On December 16, 1982, in the early afternoon, two officers came to Claimant's cell and told him that he was being transferred to the protective custody unit in the north cellhouse. He packed his property into some boxes. He was handcuffed with his hands in front of him. He carried two of the boxes and the officers carried the others. When they reached the first floor they stopped in front of the sergeant's cage to sign Claimant out of the building. At that instant Brackett ran down a flight of stairs, rushed up to the Claimant and stabbed him in the back.

Prior to the stabbing Officer Berry noticed Brackett loitering on a landing on four gallery. He told Brackett to go to his cell but Brackett declined saying he was waiting to talk to someone.

Brackett's stated motive for stabbing the Claimant differed from what the Claimant previously stated. Brackett said he was a gang member who had been ordered to put a "hit" on the Claimant as a favor to another gang outside of the prison because the Claimant was a "stool pigeon." Exhibit 1.

Although Claimant was standing upright with a nine-inch knife in his back, at the outset the officers were too confused to render him any immediate assistance.

He persuaded the officer at the main door to let him out and he started walking towards the hospital.

"I walked around the kitchen, around the dry dock, and I was about 40 feet from the main intersection, the main crosswalk of the cell house before the officers finally started catching up to me. That's when my knees started getting wobbly. I was barely moving." (Tr. 108.)

He passed out and when he woke up he was lying on a stretcher at the intersection.

"A. I was numb from my shoulders almost to my knees from the cold because it was snowing, and I was laying there with no clothes on.

Q. Were you covered with anything?

A. No." (Tr. 109-110.)

Finally after an additional delay of about 15 minutes he was taken to the infirmary at the penitentiary, accompanied by about 15 officers, the investigator, and four or five of the hospital staff. The knife was in his back the whole time.

After more delay in the infirmary, the institution physician removed the knife and the Claimant was transferred to St. James Hospital in Pontiac. He had surgery there. Because his progress was unsatisfactory, after approximately a week in St. James Hospital he was transferred to St. Francis Hospital in Peoria where he remained a few days. He was then returned to St. James Hospital in Pontiac. He returned to the Pontiac Illinois Correctional Center on December 30, 1982, and was discharged from the penitentiary the following day, December 31, 1982.

## ISSUES

I. Was the State guilty of negligence?

We find that the following acts or omissions taken as a whole do constitute negligence on the part of the State in the handling of this matter.

A. The authorities at Pontiac Correctional Center did not put Claimant immediately into protective custody when he asked for it. Claimant's Exhibit No. 15 is an inmate disciplinary report written by Gallery Officer Jackson on December 7, 1982, when Claimant refused to move from cell 338 to cell 522 as ordered:

"Charge: 307 unauthorized movement 403 disobeying a direct order, 404 violation of Rules.

Observation: At about 9:00 a.m. December 7, 1982, I c/o Jackson told Res. Petrusak #N21164, he had to move from 338 to 522. Res. Petrusak told me c/o Jackson he refuses to move on five gallery because, if I move I would be dead in a week. Resident Petrusak wrote a letter to Lt. Staley saying he wanted to go to P.C."

As a result of the letter to Lieutenant Staley, Claimant was taken to Warden McGinnis for an interview. He again asked to be put in protective custody.

Administrative Regulation 808 specifically provides that the inmate requesting protective custody shall be reassigned from the general population to protective custody as "expeditiously as possible," and that the investigation as to whether his request is well-founded shall be made within 10 days thereafter.

In other words, the inmate is put into protective custody immediately on his request, and then the matter is investigated.

"2. Within 10 working days after a committed person has been placed in protective custody, he shall appear before the Assignment Committee who shall make recommendation to the Chief Administrative Officer concerning the necessity of continued protective custody placement. The following factors, among other matters, may be considered by the Assignment Committee in making its recommendations:

a. Size, stature, age, degree of aggressiveness, criminal history, any history of being victimized;

b. *Identification of a specific individual who has threatened and can be expected to continue to threaten to physically harm the committed person requesting protective custody status;*

 c. Institutional records that indicate the person has previously had difficulties adjusting within the general population due to pressure from other committed persons;

 d. Written or verbal reports from correctional employees or others, or

 e. Other information that in the Committee's judgment makes continued protective custody placement necessary.

3. The Chief Administrative Officer or his designee shall make the final determination. The committed person shall be informed of the decision in writing. In the event that the Chief Administrative Officer or his designee determines that the person should be removed from protective custody because his protective custody needs cannot be substantiated, a copy of the decision shall be personally served upon the committed person.

4. If the committed person intends to grieve the decision, he must indicate his intent to do so in writing at the time he is served with the Chief Administrative Officer's decision.

 a. The Chief Administrative Officer or his designee shall notify the Administrative Review Board who will review the grievance and provide recommendations to the Director within 15 working days of its receipt. The Director or his designee shall make the final determination.

 b. While the grievance is pending, the committed person shall remain in the protective custody area." Administrative Regulation 808

Thus we see that even if it is determined that the inmate does not need protective custody, if the individual wishes to grieve the decision he shall be kept in protective custody pending the hearing of his grievance.

In this case the authorities merely put Claimant on gallery four, and said it would have to be investigated whether Claimant merited protective custody.

"Q. What if anything did he say to you about protective custody?

A. He said it would have to be investigated for them to determine whether I rated protective custody or not, to prove my allegations." (Tr. 95.)

The authorities' actions were contrary to Administrative Regulation 808. If Claimant had been put into protective custody on December 7, 1982, he would not have been stabbed on December 16, 1982.

When he again asked for protective custody on December 15, 1982, after the abortive attempt to stab him, the transfer was delayed until the following day, again making it possible for him to be stabbed on December 16, 1982.

B. The search of inmate Brackett following the abortive stabbing attempt was incomplete. As previously set forth, inmate Brackett claimed to have had the knife on his person at the time he was searched following the December 15, 1982, incident. The knife is described as follows:

"Metal length approximately 9 inches long, handle wrapped in black electrical tape, approximate width of blade 1/2 inch long, end of blade pointed."

This knife was not found. We think that a more thorough search would have found it. The Respondent suggested that perhaps the knife was not there and that Brackett may have been lying. We will never know. What we do know is that the lower abdomen and groin area where Brackett claimed to have secreted the knife was not searched.

C. The administration's handling of inmate Brackett following the initial assault was lax. Brackett was permitted to remain at large in the institution after it was known he had attempted to stab the Claimant. Thus Brackett, who somehow knew when the Claimant was going to be moved out of the cellhouse, was able to lie in wait for him.

The following is an incident report filed by Officer Berry:

"I officer Berry #514 came down from 5 gallery. In the process of the cage I c/o Berry #514 noticed Resident Brackett A86188 sitting in the window on Front Flag of 4 gal. I c/o Berry told Resident Brackett A86188 to lock it up. Resident Brackett A86188 told me c/o Berry *I will in a minute. I am waiting to talk to someone on 4 gal.*" (Ex. 7. Emphasis supplied.)

Furthermore none of the officers involved in moving Claimant on December 16, 1982, nor Officer Berry, had been alerted to the fact that Claimant was being moved because he was in danger from resident Brackett.

The administration failed to comply with the provisions of the Department directive for institutional internal investigations.

This matter is covered in the direct examination of Warden McGinnis:

"Q. I am going to hand you what has been marked as Exhibit 18. Could you briefly describe that for us?

A. That's a directive dated November 1, 1982, relative to the Institutional Internal Investigations; and it's signed by me.

Q. I assume that was in effect in December of 1982?

A. Yes, it was.

Q. This does relate to an investigation to be conducted when one inmate accuses another of an assault, does it not?

A. Yes.

Q. In Paragraph D-la, it reads, "All possible precautions should be taken to protect the safety of all those involved in the investigation;" is that correct? ·

A. Yes.

Q. The paramount concern or one of the paramount concerns during the investigation is to protect the inmate who alleges that he has been assaulted?

A. That's correct.

Q. It would be possible, would it not, when somebody in Mr. Petrusak's position is being moved out of the general population cell to have somebody observe the accused inmate, in this case Brackett, have somebody just go and keep an eye on him?

A. That's certainly possible, yes.

Q. It would be possible even to have a guard assigned to go shake Brackett down again, would it not?

A. That's possible, yes.

Q. You do have discretion to shake somebody down whenever you feel the need?

A. That's correct.

Q. It would be possible to simply instruct Brackett to go to his cell and to lock his cell while Petrusak is being moved out of the cell house; is that correct?

A. That's possible, too." (Tr. 30-31.)

While we recognize that fears and threats of assaults in the prisons may be common occurrences, we feel that the Respondent's actions in the handling of this incident were unreasonable. We want to make it clear though that it is not our intention to interfere with the Respondent's discretion. We are not saying unless you do this or do not do that we are going to find negligence. We are saying that, taken as a whole, the Respondent's conduct in this matter was unreasonable and the stabbing would have been preventable in the exercise of reasonable care.

II. Was the negligence of the State the proximate cause of the Claimant's injuries?

It is clear that inmate Brackett's intentional acts were the immediate cause of the Claimant's injuries. However, this third-party criminal act was reasonably foreseeable and in the context of this case the negligence of the Respondent was the proximate cause of the injuries.

III. Was Claimant guilty to any degree of contributory negligence?

No. Claimant notified the administration of his danger in ample time. When he was attacked he was in handcuffs.

IV. Citations.

Before going on to a discussion of Claimant's damages it should be mentioned that the Court of Claims cases cited by Respondent in its brief are all distinguishable from the case at hand.

*Dorsey v. State* (1977), 32 Ill. Ct. Cl. 449. In this case the assault on Claimant was without warning and committed by a man Claimant barely knew. There was nothing in the record of the assailant that would have put the State on notice that such an attack would occur. Neither Claimant nor the State had any advance information whereby the assault on Claimant could have been anticipated. Therefore, in *Dorsey* the State was not guilty of negligence.

*Allen v. State* (1979), 33 Ill. Ct. Cl. 11. Here again the State had no actual or constructive knowledge that the assailant would assault the Claimant.

*American States Insurance v. State* (1959), 23 Ill. Ct. Cl. 47. This case has no relevancy. It is a claim for property damage to automobiles committed by juveniles who escaped from a reformatory. The Court found that there was no negligence on the part of the State in the boys' escape from camp.

Since this case was tried and briefed, other decisions in cases involving attacks on inmates by other inmates have been reported.

*Skaj v. State* (1982), 35 Ill. Ct. Cl. 857. In this case the inmate who was assaulted was in protective custody and there was some knowledge on the part of the Respondent that the Claimant would need protection, which was one reason why the Claimant was in protective custody. However, minimum effort on the part of the Claimant would have placed'him beyond the reach of his assailant. Under the facts in the case the Respondent had exercised reasonable care.

*Carev v. State* (1981), 35 Ill. Ct. Cl. 96. This case involved a breach of a prison regulation which led to an attack causing serious injuries. It differs from the case at bar in that the purpose of the regulation was not to

protect residents but to control their movement. Moreover, the important element of foreseeability was not established in that there was no reason for the officers to anticipate third persons would commit a criminal act against the Claimant as a result of the breach of the regulation.

*Woodfork v. State* (1983), 36 Ill. Ct. Cl. 182. Foreseeability in this case was not established due to the Claimant's failure to adequately inform the authorities of the nature of the problems he was having.

V. Damages.

The penetration of the knife into Claimant's back resulted in extensive loss of blood and the forming of a large internal hematoma. However, no damage was done to Claimant's organs such as his kidneys or spleen, nor was any artery severed. He suffered severe pain while he was hospitalized. The pain and cramps persisted so that he was unable to work for six months after his discharge from the penitentiary. He testified that he still has some stomach pains. He first went to work in July of 1983, but had to quit because, as a result of the stabbing, he could not lift drywall which was part of the job. At the time of the hearing he was employed doing general maintenance at a home for retarded children in Wauconda, Illinois, and experiencing some difficulty with lifting. There is no proof that his ability to earn his living has been limited or reduced, except for his inability to do heavy lifting. There were no medical expenses.

It is hereby ordered that the Claimant be, and hereby is, awarded the sum of $20,000.00 in full and final satisfaction of this cause of action.