(No. 86-CC-1567—▮▮▮▮▮▮▮)

RONNIE HAMILTON, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed August 25, 1987.*

RONNIE HAMILTON, *pro se*, for Claimant.

NEIL F. HARTIGAN, Attorney General (MITCHELL WILNEFF, Assistant Attorney General, of counsel), for Respondent.

192

Raucci, J.

This is a claim brought by Claimant, Ronnie Hamilton, a resident of Stateville Correctional Center, for personal injuries sustained when struck in the face by shotgun pellets from a cartridge fired by a correctional officer.

On May 1, 1985, at about 6:30 a.m., while Claimant was about to enter dining room A for breakfast, he was hit by one or more shotgun pellets that ricocheted off the ceiling. The shot had been fired into the ceiling by Officer James Irelan as a warning shot in response to a fight, or scuffle, taking place between Officer Capeles and inmate Roberson. While Claimant was evidently hit by several pellets, his chief complaint concerns a puncture wound to the right side of his nose. A pellet became embedded there. He picked the pellet out himself, and suffers no ill effects from the incident except that it has left him with a small scar on the right side of his nose near the bridge.

An incident report prepared by Warden O'Leary summarizes the matter as follows:

"Inmate Roberson went behind the serving line and took three juices. Officer Capeles ordered the inmate to put them back, but he walked away. The officer then attempted to retrieve the juice, the inmate pushed Officer Capeles, and a fight ensued. The tower officer, J. Irelan, fired one round into the ceiling with the 12 gauge shotgun. The fighting stopped and Inmate Roberson was restrained and placed in the segregation unit * * *."

When the warning shot was fired, buckshot bounced off the ceiling and hit six or seven inmates, including Claimant, and an officer. The inmates, including Claimant, all received medical treatment. One man (Newsome) had a pellet embedded in the left side of his face; one man (Arnold) had an abrasion to his forehead; one man (Alexander) had a laceration to his ear; Martin had an abrasion; Cole had an abrasion to his left shoulder. Apparently Claimant is the only one who has brought an action in the Court of Claims.

Claimant basically makes two allegations:

A. Officer Irelan "negligently and carelessly fired a shotgun blast * * * in a crowded dining area, when he knew or should have known that these pellets would ricochet and cause possible harm to innocent people as happened to Claimant."

B. "The Respondents knew prior to claimant's injuries that the conditions for firing weapons in the dining area were unsafe and posed a potential hazard" to the health, safety and lives of the prisoners.

Officer Irelan testified that the dining room is like a wheel with the tower as the hub of the wheel. The tower has movable, glass bay windows, and an officer in the tower. The tower stands approximately 14 feet off the ground, equipped with two 12-gauge shotguns, one mini-14, 25 rounds of ammunition for the shotgun, 40 rounds for the mini-14, tear gas dispensers, a 37-millimeter gas grenade launcher, and ten rounds of tear gas for the launcher. At the time of the incident there were approximately 150 to 175 inmates in the dining room.

Officer Irelan testified that an inmate had lunged at Officer Capeles and knocked him into a wall in dining

room A. Irelan gave a verbal warning to halt. The inmate and Officer Capeles scuffled and fought. Irelan believed Capeles was in danger and fired a warning shot into the ceiling. The fight stopped.

Assistant warden Salvador A. Godinez gave lucid testimony as to the policy of the institution with respect to firing warning shots in the dining room. His testimony supported the actions of Officer Irelan.

It is entirely possible to find that the situation confronting Officer Irelan did not justify firing a shotgun into a concrete ceiling only one foot above the end of the barrel of the gun in a crowded dining room. Officer Capeles was not alone. There were two officers on the floor who immediately came to his assistance, and another officer was nearby at the entrance to the dining room. None of the four officers on the floor signaled the tower for help. When asked how much time elapsed from the time he saw the fight break out until he fired the warning shot, Irelan testified: "Maybe five seconds or so." His action seems to have been extremely hasty.

The Chief Investigator in an initial assessment prepared for the duty warden's signature reported:

"Minor scuffle between Officer and Inmate—resulting in warning shotgun blast into ceiling—six (6) inmates suffered ricochet minor wounds. No control office notification noted."

Officer Irelan gave disconcerting testimony that when Claimant, after having gone to medical emergency, came back to the dining hall around 7 a.m. (apparently to eat breakfast) and yelled up threats and obscenities to him *he put another round in the chamber.*

"When Mr. Hamilton said this, *I put another round into the chamber, and Lieutenant Price stepped in between.* I figured I'd already given a warning shot and I don't need to be second guessed by a resident." (Emphasis supplied.)

Under the Rules of the Illinois Department of

Corrections, introduced into evidence, firing the shotgun constituted the use of "deadly force." Officer Irelan testified that he believed Officer Capeles to be in danger and that the disturbance was serious enough so that it was necessary to fire a warning shot. Accepting Officer Irelan's judgment in this matter his actions meet the various tests prescribed in the rules for the use of "deadly force."

An officer in Irelan's situation necessarily has a wide range of discretion. As an officer in the tower he was not performing a ministerial duty. He was charged with discretionary acts. The question is, did he go beyond the limits of his discretion? Even if he exercised bad judgment, this is not necessarily exceeding the limits of his discretion, or abusing his discretion. However hasty Officer Irelan may have been in firing the warning shot, his testimony makes clear that he himself thought that it was a necessary action to take. Considering the entire record, and recognizing the necessity for a wide range of discretion, it is our opinion that the officer's conduct does not give Claimant a cause of action for negligence.

The claim should be denied.

It is therefore ordered, adjudged and decreed that this claim is dismissed, with prejudice.