(No. 85-CC-2892–)

DERRICK PHIPPS, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed May 16, 1991.*

*Order on motion for rehearing filed September 18, 1991.*

DERRICK PHIPPS, *pro se*, for Claimant.

ROLAND W. BURRIS, Attorney General (JOHN R. BUCKLEY, Assistant Attorney General, of counsel), for Respondents.

OPINION

Montana, C.J.

This is an action brought by Claimant Derrick Phipps, a resident of Stateville Correctional Center (Stateville), for personal injuries sustained when he was stabbed 15 times by two unknown persons, receiving stab wounds to his head, back, right shoulder, left thigh, right upper arm, and right lateral chest. The incident occurred between 7:45 and 8:00 p.m. on March 17, 1985, in Cell House B-West at Stateville.

A hearing was held before Commissioner John P. Simpson who duly filed his report. Neither party filed briefs in this matter.

To understand this case it is necessary to understand the physical layout of Cell House B-West. The record indicates that Cell House B-West is a long, narrow building, five stories high. Sometimes the stories are referred to as galleries. Other times they are referred to as tiers. The cells are all built along one wall, with approximately 55 or 56 per floor. The ceilings of the cells on one story are the floors of the cells on the story above. The cells on each floor open into a walkway about 3 feet wide which runs the length of the building and is referred to as the "gallery." The inmates are protected from falling off the gallery by means of vertical bars which run from the first floor to the roof. Each gallery terminates in a stairwell with a gate. The gates at the rear

of each gallery are kept locked at almost all times, except when the rear staircases are used for specific purposes; whereas the gates at the front end of the gallery are apparently frequently unlocked, allowing the residents access to the front stairwells. Beyond the galleries is about 15 feet of open space to the far wall of the building which is blank, except for a few small windows, a few lights, and a catwalk (at a level approximately between galleries 7 and 9 on the other wall) for use by the officers in patrolling. An officer walking on the catwalk would have direct vision into the galleries and cells across, at least into the upper galleries, depending upon the amount of natural or artificial light.

At the hearing Claimant testified as follows. On March 17, 1985, he had lived in cell 705 on 7 gallery for approximately three months. Except for going to meals he had spent most of the day in his cell painting it. About 7:50 p.m. he left his cell and went to 5 gallery to visit a friend. The gates on 7 gallery and 5 gallery were open. There was no guard on 7 gallery but·there was a guard, Officer Soliday, on 5 gallery standing just inside the front gate. Claimant greeted him and went on down the gallery to cell 529 (halfway down the gallery) to visit a friend whom he knew only by the nickname "Blood." Claimant passed three or four inmates on the stairway. The following occurred concerning the need to get permission to go from one gallery to another:

"Q. Did you have to receive permission to go from 7 gallery to 5 gallery?

A. No.

Q. As far as your understanding, what were the restrictions on a resident going from one gallery to another?

A. There is none.

Q. Did you have to ask a guard?

A. Sometimes you might have to ask if the gate is locked; but when the gate is open, they just let you walk wherever you want to go ° ° °." (Tr. 19.)

Claimant testified that Blood was in his cell which was locked. The cell locked automatically when an inmate closed the door. As Claimant was standing outside Blood's cell talking to him, he was facing the back stairwell in the direction of the higher numbered cells with his back to the front stairwell from which he had just come.

After talking to Blood about three minutes Claimant felt something touch his back. He turned around and saw two persons. They each had on stocking caps pulled down to about the level of their Adam's apples, with holes cut in the stocking caps for their eyes. One person had a knife. Claimant immediately attacked the person with the knife and the other person then produced a knife. He described the knives as pieces of metal with tape on for handles. One knife was about nine inches long. When he hit the first person, the second person stuck him in the right side. The first man succeeded in holding Claimant with one hand and then both men continued to stab him. Neither of the men said anything to Claimant.

Claimant testified that none of the residents came to his assistance since the ones who weren't in their cells were trying to get away so they wouldn't become involved. Neither Officer Soliday nor any other guards were in sight. When Claimant finally broke away from the man who was holding him, his two attackers ran toward the front end of the gallery. Claimant then managed to get up and lean on the bars. The next thing he saw was another inmate who was a friend, James Robinson, coming down the gallery toward him.

At the hearing James Robinson testified that upon finding Claimant he stuck his head through the bars and looked down to 1 gallery. He didn't see anyone but

called out that a man was hurt on 5 gallery. Officer Soliday and two other guards then came into view on 1 gallery. Robinson then called down to Officer Soliday who replied he would be right up. Officer Soliday and Officer Miller then came up and unlocked the gate. Robinson sat Claimant on the stairs. Officer Soliday and Officer Miller sat with Claimant while Robinson went down to 1 gallery and told the Lieutenant on duty, Lt. Pringle, that Claimant had been stabbed. Lt. Pringle called medical emergency and Robinson went back upstairs to help bring Claimant downstairs.

Claimant was then taken to the prison hospital and thereafter to Silver Cross Hospital in Joliet, Illinois, where his wounds were stitched. He was brought back to the prison hospital where he remained for four days. He testified that after he was released from the prison hospital he was unable to return to his prison job in the yard department for about a month and that during that time other prisoners would bring him his food to his cell so he wouldn't have to go to the dining room.

Claimant's complaint alleges his injuries were caused, in general, due to Respondent's failure to exercise proper care and safety for persons confined to Stateville. More specifically, Claimant asserts Respondent maintained improper lighting in Cell House B-West which enhanced the possibility of attacks and that Respondent failed to provide a proper number of officers in Cell House B-West to prevent attacks.

In *Petrusak v. State* (1987), 39 Ill. Ct. Cl. 113, 114, this Court stated:

"The State is not an insurer as to the safety of an inmate in its custody. It does however have a duty to exercise reasonable care under the circumstances to prevent its inmates from suffering harm at the hands of other inmates. ° ° °

Foreseeability of potential for harm is a necessary element which must be proven by the preponderance of the evidence in this type of case. What is foreseeable necessarily must be judged by the facts in each case and by taking judicial notice of the prison environment."

In cases where inmates have been assaulted by other inmates this Court has determined that to prove foreseeability of potential for harm it must be shown that Respondent's agents anticipated, or should have anticipated, that third persons would commit criminal acts against the particular inmate who was attacked. See *Carev v. State* (1981), 35 Ill. Ct. Cl. 96; *Childs v. State* (1985), 38 Ill. Ct. Cl. 196.

From the record in the case at bar it appears possible that better lighting and more guards might have helped prevent an attack in Cell House B-West. The record further indicates an attack might have been prevented if guards who were on duty were following institution procedures. At the hearing the following exchange occurred between Respondent's attorney and Lt. Pringle:

"Q. Is it the ordinary procedure or the rule regulation that inmates can freely circulate among the five tiers after dinner and before lockup?

A. Not ordinarily. The gates are supposed to be locked.
They are supposed to stay on each gallery.

Q. Those gates remained locked at all times?

A. Yes, except for during line movement, like going out for chow or yard coming in.

Q. At approximately 8:00 p.m. (the approximate time of the attack on claimant) on March 17, of 1985, were there any line movements in effect or were they—I guess I should say—

A. At 8:05?

Q. P.M.

A. I really can't remember.

Q. Would there ordinarily be?

A. Gym is usually over. If there was night gym that started at that time, there would be.

Q. I am sorry? I didn't quite understand.

A. I am trying to think.

Q. Let me be more specific.

At that date and time, do you recall there being any line movements that would have allowed gates to be opened?

A. No.

Q. But just to clarify once again, there was not policy of freely circulating among these galleries with gates open at that time?

A. Correct." (Tr. 83-85)

Despite the foregoing testimony that the gates should have been locked, Claimant testified he walked through open gates when he left 7 gallery and entered onto 5 gallery. He also testified that the front gate on 7 gallery was not only open but unattended, while the open front gate on 5 gallery was at least attended by Officer Soliday. The Court can only speculate as to how the Claimant's assailants reached 5 gallery or where they came from. But the alleged policy of keeping the front gates locked at all times and each inmate in his own gallery did not prevent the assailants, equipped with ski masks and knives, from reaching their planned destination.

Unfortunately for Claimant, however, a claim of this nature cannot be successful if the claimant fails to show Respondent's agents knew or should have known he would be singled out for attack. (See *Carev*, *supra*; *Childs*, *supra*.) No evidence has been presented indicating Claimant warned Respondent's agents he was in danger of attack by other inmates or that Respondent's agents otherwise knew he was in danger of attack. We find that Claimant has failed to prove Respondent's agents had sufficient notice so that the attack upon Claimant could have been foreseen. This claim must therefore be denied.

Wherefore, it is hereby ordered that this claim be, and is, hereby denied.

## ORDER ON MOTION FOR REHEARING

MONTANA, C.J.

Claimant's motion for rehearing is denied.