(No. 90-CC-1997-▇▇▇▇)

RICHARD BERRY, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed March 7, 2000.*

ANTHONY M. PETRONE, for Claimant.

JIM E. RYAN, Attorney General (EDWARD C. SEWARD III, Assistant Attorney General, of counsel), for Respondent.

## OPINION

JANN, J.

Claimant, Richard Berry, seeks an award of damages for injuries suffered while an inmate at Stateville Correctional Center on April 24, 1989. His complaint seeks $75,000 in damages for pain and suffering and mental anguish as a result of the alleged negligence of Respondent in injuring Claimant and failing to provide adequate medical treatment for the injury.

Hearing was held before Commissioner Jeffrey T. Whipple on August 17, 1998. Claimant was granted several extensions of time to file his brief and proposed excerpts of the record by Commissioner Whipple. No briefs were received from either party.

Claimant appeared and testified on his own behalf at the hearing. Respondent presented Captain Christopher Hughes, a correctional officer at Stateville presently and assigned to Claimant's unit at Stateville on April 24, 1989. Captain Hughes witnessed the events surrounding Claimant's injury and apparently summoned medical assistance on his behalf. However, Captain Hughes did not witness the actual injury.

The following is a summary of the often conflicting evidence of record.

Mr. Berry was an inmate resident of Unit A, protective custody at Stateville, from 1987 to 1990. He was again incarcerated in an IDOC facility from 1994 to 1996. On the hearing date, he stated he resided in Chicago and was employed as a computer information systems support

manager. He had completed a bachelor of science degree and had begun a master's program since his 1996 release.

On the late afternoon of April 24, 1989, Claimant was proceeding in a chow line outside of H Block with approximately 200 other inmates. A fight broke out between several inmates and, very rapidly, a crowd of inmates began to "move" toward the combatants to watch.

The record at hearing and the State's departmental report show that the IDOC officers on duty on April 24, 1989, were Officer Roosevelt Robinson, who was positioned in the south yard tower, Officer Julius Bradley in the south wall tower (tower 10) and Officer David Caeman, Captain Gordon Lemons, Sergeant Lee and Officer Hughes who were in various positions on the grounds or yard area where the inmates were proceeding to the chow hall. We note that the positions of Officers Bradley and Robinson were apparently misidentified by the parties at hearing based upon the evidence in the departmental report.

The evidence indicates a fight among three inmates, at least one of whom had a knife or homemade blade, was proceeding in front of the H-House gate. IDOC officers, including Sergeant Lee, Captain Lemons and Officer Caeman, attempted to separate the inmates and radioed for assistance, and an IDOC officer was slightly injured. It is not clear who first radioed the call for assistance, but all officers agree that a call was received and that they all became aware of the fight within a matter of seconds by both radio and visual inspection. Verbal warnings were given by the officers in the yard to cease and disperse, as a large group of inmates had begun moving to surround the combatants. The IDOC officers were attempting to handcuff the fighting inmates and the struggle continued as a warning shot was fired from one of the towers. When

the inmates failed to fall back, a second warning shot was fired and verbal warnings were given to lay down to avoid injury. One of the tower officers fired a third shot in the vicinity of the combatants when he observed they were still struggling with corrections officers.

Claimant was struck in the left upper portion of his scalp by a single pellet of a number 4 bird shot, subsequently determined to have been fired from Officer Bradley's shotgun (the first shot). Claimant was not involved in the disturbance and was standing at least 40 feet away. He was knocked down by the shot and taken to the infirmary immediately after order was restored. He was assessed and x-rayed to determine where the pellet was lodged. The pellet was removed and his wound was cleaned and sutured with eight stitches. He was given a tetanus shot and pain medication for a headache. He was then admitted to the infirmary for observation. The medical records introduced at hearing indicate Claimant demanded to make a phone call later that evening. Upon denial of his request, Claimant broke the windows of his room in the infirmary and was removed to a "special evaluation ward" where he was segregated and given a psychiatric assessment. He was returned to his cell on April 26, 1990, and continued to be monitored and treated by the medical staff until May 3, 1990, when it was noted the wound was healing well after removal of the sutures and his headaches were responding well to an analgesic. Claimant presently has a one- to two-inch scar which is covered by his hairline, and he suffers no permanent effects from the injury. He reported pain at the time of the injury and treatment.

Claimant asserted that the actions of IDOC officers resulting in his injury constituted the use of excessive force and violation of IDOC procedure. An IDOC internal investigation report was accepted into evidence. The

internal report includes statements of the corrections officers on duty and Claimant. An Investigator Heltsley interviewed the witnesses and submitted the report. We are not advised of how the investigatory process began or what actions, if any, resulted from its findings.

Captain Hughes testified that he had filled out an incident report but was not interviewed by the internal investigator. He further stated that all disturbances are investigated. No further testimony or evidence was offered by either party as to the ramifications of such a report or the weight to be given its contents in our deliberations. However, no direct rebuttal of the facts or findings was offered by Respondent. Both Captain Hughes and Claimant stated that the practice of firing warning shots during a disturbance is within normal practice and procedure in correctional institutions. Both further acknowledged that, in more serious disturbances, deadly force may be employed.

Our review of the record leads to the conclusion that the internal investigation report and its underlying statements and reports are the best evidence available as to the events at issue.

The statements of the IDOC officers are consistent as to a perception of real danger to the three officers attempting to separate and subdue the inmates who were fighting in the midst of nearly 200 other inmates. All agreed that the warning shots fired from the towers were necessary and appropriate. There were also statements by several of the officers that, as officers were in imminent physical danger, firing at inmates would be justified. None of the IDOC officers knew Claimant had been wounded until the altercation was over and the other inmates left the yard. Claimant lay prone when Captain

Hughes observed his wound, then summoned the medical technicians.

The officers' statements on the incident date clearly indicate that no one knew how Claimant was wounded or by whom. Claimant alone asserted that he was certain the first shot fired had injured him. The confusion among the IDOC staff is understandable, considering the physical layout of the yard and towers and the presence of a large group of inmates surrounding the fight.

Officer Robinson was thought to have fired the shot which injured Claimant early in the investigation. Robinson stated he saw the inmates and officers fighting and a group of 15 to 20 inmates moving toward the fight. Robinson called for assistance and heard a shot fired from elsewhere in the yard while on the radio. He then fired a warning shot over the heads of inmates and staff in the vicinity of H-House, and repeated a verbal warning to cease and disperse. Most of the inmates had either moved away and lay prone on the ground or against the fence after Robinson's first shot, but a group of 15 to 20 inmates remained standing near the officers and inmates who were still fighting. Robinson then fired a second shot at the closest inmate involved in the fight. He observed no person shot as a result. The fight stopped and order was restored immediately after Robinson's second shot.

Officer Bradley heard, via radio, of the disturbance between inmates and IDOC staff. He could not see the fight, but knew that there were only three officers in the yard and over 100 inmates en route to the chow hall. He immediately fired a warning shot in the general vicinity of H-House over the heads of the inmates in an effort to quell the disturbance.

Both Robinson and Bradley had recently qualified with all departmental weapons issued, including the

model 870 Remmington shotguns, per the report. The shotguns were collected and subjected to a ballistic analysis at the Illinois State Police Crime Lab, along with a sample of the standard issue number 4 shot. The pellet removed from Claimant's scalp on April 20, 1990, was also analyzed to determine whether Claimant had been struck by ricochet, rather than direct, fire. Extensive tests employing a laser sight and recreation of the Claimant's position in the yard were done to establish lines of sight and trajectory of weapons fire from the south yard and south wall towers.

The tests concluded that Claimant was most probably struck by a pellet from Officer Bradley's shotgun. They found that it would have been virtually impossible for Officer Robinson's fire to strike Claimant, unless he was leaning out of the tower at an extreme angle.

The report concluded that Claimant was an innocent victim shot by a pellet from Officer Bradley's weapon and that "the charge of use of excessive force is substantiated in that Bradley shot Berry trying to quell a disturbance while Berry was an innocent bystander." (at page 4 of internal investigation report dated 8/22/89, joint exhibit A.)

We have no evidence to determine the basis for the finding of "use of excessive force," other than the fact that Claimant was wounded. Ironically, the facts recorded in the report actually lead to the conclusion that there was no intent to injure on the part of either officer, and that Claimant's injury was the purely accidental result of warning shots fired according to the standard IDOC policy referenced by the report.

The Court has held that a prison officer faced with an inmate disturbance is afforded a wide range of discretion as to the force which may be used. The total circumstances are to be considered in determining whether an

officer's conduct was negligent. *Hall v. State* (1994), 46 Ill. Ct. Cl. 391, citing *Hamilton v. State* (1987), 40 Ill. Ct. Cl. 191 and *Simmons v. State* (1991), 44 Ill. Ct. Cl. 304.

It is well settled that the State is not an insurer of the safety of inmates in its custody. However, the State owes a duty of reasonable care under the applicable circumstances to prevent inmates from suffering harm at the hands of other inmates. (*Petrusak v. State* (1987), 39 Ill. Ct. Cl. 113, 114, *Phipps v. State* (1991), 44 Ill. Ct. Cl. 105, 109.) We interpret this duty to include restoration of order as quickly as possible in the event of a disturbance. But for the conclusion of the IDOC's internal investigation report, we would find Respondent's actions reasonable under the circumstances. However, as the report is unrebutted and unexplained, we must consider its findings determinative of the issue of negligence imputed to the State.

Claimant's counsel represented at hearing that he seeks only damages for pain and suffering and has apparently abandoned any claim for negligent medical care. There is no evidence of out-of-pocket expense or permanency of injury. Claimant's testimony as to his prior medical history is rather contradictory and was found less than credible by the Commissioner. The medical records indicate a pre-existing history of numerous medical complaints, including headache and insomnia, and continuing requests for prescription pain medications during his juvenile incarcerations. Similar complaints and requests for pain medication are recorded for the balance of Claimant's incarceration which followed his injury, with few objective findings as to alleged maladies.

We find Claimant has presented evidence to support an award of $3,000 for pain and suffering as a result of his injury.

Claimant is hereby awarded $3,000 in full satisfaction of his claim.